135683, John A. Robinson v. United States of America. Oral argument not to exceed 15 minutes. Thank you. I have reserved five minutes for rebuttal. May it please the court, my name is Katie Steffes here on behalf of petitioner-appellant John Robinson. As is very clear by the Sixth Amendment of the United States Constitution, the serious of criminal charges is not something to take lightly. The everlasting effect especially of a federal criminal conviction is something that will live with a defendant for the rest of their lives. It is a very foreign process for most people and that is why the Sixth Amendment affirms that a defendant has the right to the effective assistance of the vital roles of the proceedings. As has been noted in appellant's brief, in this case one of the key glaring deficiencies that was provided by Mr. Robinson's trial counsel in this case was the failure to properly object to the search and seizure of the black Lincoln where the majority of the damning evidence was found against Mr. Robinson that was introduced at Mr. Robinson's trial counsel to properly object to this evidence being admitted is the type of ineffective assistance of counsel that the Sixth Amendment is designed to protect against. The district court in this case we believe properly found that there was an ineffective and illegal search in violation of the Fourth Amendment based on the bare-bones affidavit that was submitted by the police officers to the magistrate judge in this case. Did the district court address this automobile exception argument that the government has made on appeal? Not specifically, but I can take a few moments to address that actually. The automobile exception that was raised by a police in their brief asserts that at the time in 2007 and 2008, which was the relevant time for objecting to this presumably illegal search, basically says that the officers that stop a person that was a recent occupant of the vehicle, first of all if they arrest them they can search the vehicle incident to an arrest. To address that point, my argument is first of all the officers in this case did not observe Mr. Robinson in the vehicle. They didn't observe him get out of the vehicle. They didn't observe him driving the vehicle. Because the law has changed a bit. Yes. You know, so my recollection is the officers can search incident to arrest if they think that the vehicle is going to have evidence related to the reason why they arrested the person. Right. There's no arrest at the time the vehicle, is it, well had the vehicle, had he been arrested when they towed the he was taken into custody and taken to, and I believe taken into the police. He was arrested in the sense that once the dog knocked him down, that's right, he was under arrest. He was under arrest at that point. Presumably at a minimum, at a minimum for fleeing from the police and being near the somewhat incriminating clothing. Right, that's correct. He had been found, I mean the somewhat he had jumped out of. It was a fenced-in garbage area, which was about a hundred feet from where this black Lincoln was located. At that point, and the black Lincoln had apparently been driven quite recently, it matched what the Mr. Harris had seen and the hood was worn. Well, yes, and well it sort of matched what Mr. Harris had seen. Mr. Harris had reported that he did not have a good vision of what color the vehicle was, just that it was a large-bodied dark vehicle. Who knows what that could have been. But yes, it had indicated that it had been driven recently. This was two and a half hours after the attempted bank burglary at the night deposit box. So that in and of itself, the fact that there was a warm cover to the vehicle, does that even match up with the crime that had happened two and a half hours earlier? Presumably not, because why would the black Lincoln still be there that having recently been driven would be my first question. But secondly, there still has to be some belief, as you pointed out, that there is going to be evidence of the crime in question found in the place to be searched, the vehicle. The only thing that the officers observed at the time that they were looking for Mr. Robinson, arresting him, during those few minutes where all of this was happening, was a road atlas. That's it. On the passenger side of the vehicle. So there's this like trash enclosure that he jumps out of and they find the clothes in there, right? Right, after they arrest him, they find the clothing. How far away is the vehicle from that? Is it backed right up against that? No, it's not. I think that the trial transcripts reveal it's approximately 50 to 100 feet or so from where that was. So that's like 2 or 3, 4 parking spaces away. Yes, it is. It's not, you know, halfway down the block. It's not halfway down the block, but it's also not right there. Nobody had observed him walking away from the vehicle. It's 3 in the morning, right? It is. Presumably there aren't that many drivers. But we don't know that. I mean, that in and of itself. 3 in the morning. It is. But we don't know how many other vehicles were around there. That was not elicited at trial. We don't know, you know, we don't even know at that point that this vehicle is in any way linked to Mr. Robinson. We don't know, at this point, when all of this is happening, that it's even linked to the attempted burglary that happened at the Fifth Third Bank. It's a completely different location. Two and a half hours later. Well, the completely different location, is it not that the trail of the bank robber, whoever it was, went in that direction, the Erlanger Lakes? He went, yes, in that direction. The trail went in that general direction. On foot. Right. Two and a half hours earlier. Yes. Earlier. Yes. Yes. And there's the stuff about the perimeter. Did that all get to say that random people wouldn't have been able to come in and out of this area? Right. That, to me, in reading the trial transcripts, was not entirely clear, first of all, at what time that was set up. Secondly, it appeared to be that they were monitoring people that were leaving the apartment complex. That seemed to be the focus of the officers patrolling the perimeter. It was not to me in reading the trial transcripts that they paid much attention or any attention at all to vehicles entering the apartment complex. But not only that, it was set up after the second officer arrived with the second canine unit. Okay. So there still was a period of time between when the bank burglary occurred and when the perimeter was set up where people could come and go as they being there to patrol that area. But I still think that even with the automobile exception and the search incident to an arrest exception, there still is not enough of a link that has been demonstrated here to link Lincoln to either Mr. Robinson or to the bank burglary. And that... In terms of competence, am I right? They did file a motion to suppress, but only with respect to the some indication that he'd thought about it. And his view of the law at that point maybe was the closed containers don't come under the automobile exception in the same way that the contents, visible contents do. Yes, that's true. But also his trial counsel that had filed that motion also said that the reason why he didn't challenge the affidavit and the entire search to begin with was because he believed improperly that there was no standing to challenge that search. That is completely against what the law was even at that time. But also even looking at the case law that was in effect at the time... But so did Robinson... At that point, you were talking about there's no link of him to the car. He would have to at least say that he had been in the car, right? In order to have standing. If he's just a guy walking down the street, he wouldn't have standing. Right. And that came later. He did actually tell the police later on that his foster brother had let him borrow that vehicle. I understand. But in order to raise the standing, he would have had to say that at the same time, would he not? Right. Okay. Yes, that's correct. But I still think that the district court was correct in that it was an illegal search because there was not the... So getting to where we have in the prejudice... And that it was prejudicial to Mr. Robinson because... I'm trying to ask a question. Yeah. No, that's okay. That's okay because you were getting right to what you... Give me a minute or so on why in the face of the evidence that did come out without... If you threw out that part of it... Would he still have been... It's correct. You don't have to show that there would have as the original... I'll give you 30 seconds or a minute to answer that and not come out of your time. Yes, I do believe that it was prejudicial because Mr. Robinson... The only connection to the bank burglary after that was Mr. Robinson's testimony at trial, where his trial counsel asked him about the tools that they had found in the field, which were almost identical to those found in the... The clothing would be one connection. That would also be another connection, yes. But there was nothing that was introduced by the prosecutor at trial that linked the clothing to Mr. Robinson other than the mere proximity of where he was hiding, which of course is not great. That's not great. That's a pretty solid link. It is. That is a pretty solid link, but... There's not a reason to wear a ski mask in Kentucky in September. Well, he didn't have it on. It was just merely on the ground where he was hiding. With the white gloves. Yes, with the white gloves. However... It didn't seem to just come from a... Does that mean proof beyond a reasonable doubt? I don't think so. Okay. Thank you. You'll have your five minutes for rebuttal. Good morning, your honors. Adam Reeves on behalf of the United States. May it please the court. Your honors, I'll get right to what I think was the most pertinent question asked in the questions that you did for appellant. And that is, when was the perimeter set up? This is established in the record at page 973 in Detective Aylor's testimony. And he says that the perimeter was set up around 2.30 a.m. That would have been about half an hour after the initial alarm sounded at the Fifth Third Bank on Dixie Highway. And importantly, in describing the perimeter that was set up, Detective Aylor and the other law enforcement officers who testified all talked about there being only one single way in or out of the Erlanger Lakes condominium. The perimeter, when we talk about the perimeter, it's around the Erlanger Lakes complex. That's correct, your honor. And presumably, it would have also been around the area surrounding the bank as well, because these were, while fairly close in proximity, treated as two separate areas. And in this case, that's important because it helps establish probable cause to support the warrantless search of the Black Lincoln. And here's why. That warm hood that was discussed in the direct argument just a moment ago is important because they discover the car being warm after roughly 4.15 a.m. That was over two hours since the establishment of that perimeter. So that car would have been driven around and obviously not driven in or out of the Erlanger Lakes condominium complex at about, like I said, 4.15. So it would have been recently driven and it corroborated the testimony that Eugene Harris gave where he said, look, I called 911 and told them that I saw this suspicious person standing around outside, that he got into this car and then attempted to drive away. What time was that call again? The call was made, I believe, roughly around 4.15, although... So the officers arrive and feel the hood very shortly after the call? That's correct. They're probably a quarter mile away, right? That's correct. And in fact, I believe it's Officer Lilich who's guiding one of the police dogs around the field outside of the Aldi's parking lot when he testifies at trial that as we were searching this field, we received a call regarding a suspicious person in the parking lot of the Erlanger Lakes condominium. And that's when we proceeded back there and found the Lincoln. And very shortly after finding the black Lincoln, did they, of course, find Mr. Robinson when he fled from the dumpster area. Ms. Steffies says, based on her reading of the transcript, that it's not clear the perimeter was excluding drivers from coming in as opposed to leaving. Do you agree with that? I disagree, of course, respectfully, Your Honor. Do you have a specific testimony you would point to to show that, I guess, what, I mean, that they're excluding people from the perimeter? Your Honor, I think there are two places we can look to in the record that answer this question, albeit somewhat obliquely. Detective Ehler, when he talks about the perimeter, and I think maybe one of the other law enforcement officers referenced that there was only one way in or out of the Erlanger Lakes condominium complex. I would also direct the court to review Eugene Harris's testimony. Because Mr. Harris talks about, I believe he got on his bicycle to go to work and encountered the police having already set up their perimeter. And this was sometime after, I believe, about 3.30 a.m. How does any of that show that they weren't letting people in? I mean, my point would be that, theoretically, you know, they set this thing up at 2.30. Theoretically, the vehicle might not have been driven around inside the complex an hour and a half later. But if they're not blocking people from coming in, somebody might have come in at 3.45, coming back from working at, you know, Walmart or something, I mean, for a late shift. Certainly, Your Honor. And I think Ms. Leonard elicited some of this testimony in her questions to some of the law enforcement officers talking about the perimeter in general. I think there are a couple of specific ones, although I can't recall the page offhand, where she says, you know, what's this perimeter? And they said, basically, it's a way to keep people from coming in and around. I think that's the fair understanding of what the perimeter was. And the reason, I think, for its importance is because it adds to that probable cause determination that would have supported a warrantless search of the black Lincoln. But that's not the only evidence that supports the search of the black Lincoln. Of course, we have Mr. Robinson's proximity to the car. We also have Mr. Harris's description of the suspicious person having driven it. And I think what's actually important to point out, too, is that Mr. Harris says, well, when he initially observed this person who turns out to look an awful lot like Mr. Robinson get in and drive away, that that person turned left and seemed to have no idea where they were going because they drove down a road that would not have led them out of the apartment complex. And what do we have to corroborate the fact that that same car is the one that they found as the black Lincoln? Well, it has a Louisville area license plate and it had a road atlas visibly seen in the front seat. And that suggests that that black Lincoln is not from around here. Just as Mr. Harris said, look, the person driving it didn't look like they had any idea where they were going. Because the reason we're interested in all this who shot John is that the alternative explanation that it's Mr. Robinson in the car is that it's some random inhabitant of the complex who knows what he's doing and is local. Correct, Your Honor. And I think it's important to also consider whether the search of the car was truly prejudicial or not, even assuming, of course, I would object to that, but assuming, of course, that they should not have searched it. And here I think it's incorrect to say that the majority of the evidence in this case came from the black Lincoln. We have a substantial amount of evidence that's provided by Mr. Robinson himself. He not only... Let me ask, why doesn't the calculus change for Mr. Robinson in terms of his decision to testify if the evidence from the car doesn't come in? Unlike other witnesses in a case who may have no choice, a defendant makes that choice about whether or not to take the witness stand. Presumably, he has competent counsel to advise him before he takes the stand. And he conducts a cost-benefit analysis in deciding, is there enough to gain risk getting in the stand versus the cost of me getting in the stand? In his case, the cost was substantial, was it not? That is, his criminal felony record came out, along with the fact that he was on supervised release and was out of district without permission of his probation officer. Weren't those serious costs for him to assume by taking the stand, but perhaps felt he had no choice but to do so? Because A, the evidence from the car was in to tie him what appeared to be the criminal tools in the field. And secondly, on a related matter, he might have felt he had to give an explanation about why he was there in the first place. But if the evidence on the car is out, why assume that risk? Why not simply hold the government to its burden? Well, I think there are a few different ways to answer your question, Your Honor. And I think the first is that, quite simply, there's no evidence in the record that suggests any particular reason why Mr. Robinson decided to take the stand. The district court... But counsel, a defendant wouldn't ordinarily sign an affidavit prior to taking the stand at trial to say, here's why I'm taking the stand. I mean, the district court judge went over with him what the risks were. Can't we assume that if he had competent counsel, that they made a tactical choice for him to get on the stand based on the evidence the government had already presented in its case in chief? And if that evidence changes because of suppression of the search of the vehicle, why doesn't the calculus change for the defendant testifying? Your Honor, I think certainly there are lots of different reasons why a defendant might take the stand. And I'll certainly grant your point that this would have been one of those reasons. But I don't know that we can, on appeal, distill the reason for taking the stand to one singular factor without any other... Do we need to distill it to a single factor? Or do we simply need to say how much... How plausible is it that it would be a reasonable probability of a different outcome? I mean, if we're doing prejudice analysis, that's still the bottom line factor. So while you can take that into account, you kind of still have to make it as part of your reasonable probability. Certainly calculus. And the question I put to you there is... I'm granting Judge Helmick's point, which I think is a good one, that the strength of the tools in the car adds to the incentive to testify. What incentive to testify would he have had otherwise? To explain the clothing similarity primarily? And his presence in the middle of the night? Because both of those would have been permissible anyway, right? Correct, Your Honor. And I think the answer to your question is the second response to yours, Judge. And that's the entirety of his testimony did not focus simply on why was I around the black Lincoln. In fact, Mr. Robinson, in a very damaging fashion, contradicts law enforcement's testimony on a number of points that were unnecessary. There's a fairly lengthy debate about exactly how far and how did he flee from police. And that's certainly one of the reasons why Mr. Robinson would have taken the stand independent of the admission of the evidence from the black Lincoln. It doesn't appear from a fair reading of the record that the thrust of what his testimony is, is here's a legitimate, that is lawful reason why I was here. And here's my explanation as to why these tools found in the vehicle I was driving, which are eerily similar and suspiciously similar to the tools that were found in the field, wasn't it to offer an explanation of that. And in the absence of that evidence coming in, there's simply nothing to tie him to the criminal tools in the field, right? You took DNA, government took a DNA sample, you took fingerprints, you took shavings from where there had been drilling at the bank itself. There's no forensic evidence offered at this trial or suggesting that any of that evidence that was offered somehow ties it to Mr. Robinson, is there? Independent of his admission, no. Part of the reason why fingerprints weren't taken is because of the dust that was kicked up during this process. And it was simply not able to. It's not as if he had... But what about fingerprints on the tools? I mean, there were tools that were abandoned there. Presumably those could have been printed. Was there no comparison done of those? Presumably. There's certainly no evidence in the record, Your Honor, that indicates that there were fingerprints existing on the tools or that they were compared to Mr. Robinson's. Was that... I mean, they indeed took a DNA sample from him, I think, the very next day. That's correct. Did they ever type that and look at it vis-a-vis what was on the tools? That is, if you handle tools nowadays, you're likely to have enough, you know, tools that you've handled. We might presume that. There's no evidence in the record. The questions about this were never so specific as to say... I guess, I mean, the reason I ask that is because I thought there was some hint somewhere in here that, well, we already had the tools in the car, so we didn't need to do the DNA. So if you're speculating both ways... Then that may be true. ...you would have gone, I don't know, am I misremembering something about that? Or is that just your argument somewhere? Your Honor, my recollection of the record is that there was never any testimony saying... Period. We took DNA and compared it and didn't come up with evidence. I just don't think the questions quite got there. He was wearing gloves, though, it appears. That's correct. The individual person was. Yeah, but it's not so much what he was doing at the time as if these are his tools. I mean, if I were the CSI guy, I would want to know if he'd handled the tools, you know, a month earlier, there still might be stuff. But we just don't know what them... We're all speculating. And relatedly, following up on Judge Boggs's question in line of inquiry, there may well have been DNA in the clothing, right? I mean, the description of the perpetrator is either it's an African-American or it's a white person wearing a dark mask. Wasn't that some of the testimony that was elicited from the witness on arrival at the bank, essentially? That's correct. I believe they described his face as being dark, and that was either because of his race or because he was wearing a ski mask. So that... Oh, I'm sorry. No, go ahead. So that clothing that's found in close proximity to him, when he jumps out, presumably, if a mask was worn or other clothing was worn, there might have been fibers or hair fibers for mitochondrial DNA or skin cells or sweat or other materials. Is that right? Presumably, there could have been, Your Honor. But can we assume that either they weren't tested or if they were tested, that testing was unfavorable to the government? You can certainly presume that. And I'm saying there's simply no evidence in the record that suggests there was any forensic link between tools or clothing. The defense knew the DNA had been taken, right? There was a warrant for it. Yes, I believe so, Your Honor. And I think, independent of any of the significance of the lack of forensic evidence, what we still have is an individual who flees from the general scene of a crime and, in doing so, gives an explanation that is wholly incredible as to why he did that. I think something the jury could consider was, yes, of course, he takes the stand to explain away his flight, but his explanation is that he was stopped a week previously and sort of wrongfully accused by law enforcement at that time of having committed a murder. And so that was his reason for hiding and then running away, is that he didn't want to be seen as the other John Robinson that was wanted for murder. I think the jury can look at this, use its common sense and say, I'm just not buying this. And I think... I don't disagree with your conclusion for a moment. My concern is, why get on the witness stand? If the tools are out from the vehicle, why get on the witness stand and take those risks? Why take the risk? We presume that jurors will follow the instructions that they're given by the court, and they are told that they can only consider his conviction for purposes of his credibility. But why take the risk of that coming out as well as being out of district on supervised release? Why run that risk and get on the witness stand when the tools are out? And there's a passage of time, is there not? There's an initial dog that comes on scene that goes to the grassy field, that goes to the edge of the woods, that goes to the parking area nearby, and doesn't alert at all. And so there's an hour or two that goes by before Sambi, the second canine, comes forward and then finds the tools. And then, only then, is the defendant discovered inside the enclosure, and he flees and the dog stops him. I mean, there's that break in time and sequencing. And the area is clear upon first pass by the first dog, is it not? Are you referring to the field north of the Aldi's parking lot? And along the woods in the adjacent parking area. I believe the record supports that the first dog searched that area and did not alert. It was only when Sambi arrived that they found incriminating evidence like the tools in the field. Well, let's recall, too, Your Honor, that at the initial pass, Officer Dickerson and then Officer Ruber were looking for the defendant. There was not a specified search for physical evidence left behind. So that might explain, in addition to the knee-high grass, and the fact that this was in the middle of the night, why they failed to find those tools along the first pass. I'm not criticizing them for their failure. I'm merely saying there's some time that passes by before they discover their suspect. That's correct, Your Honor. The robber, the true robber, apparently from this, got to the woods at the edge of the field and they lost him at that point. And I take it that that location is in some proximity to the condominium. Yes. He could have gone many other places, but he clearly could have gone to the condominium. That's correct. One of the places. The suspected burglar at that point was fleeing in the direction of the Erlanger Lakes condominium and went through the tree line separating the two. Any other questions, judges? No. Thank you. Thank you very much, Your Honors. You have your five minutes for rebuttal, Ms. Steffes. You know, one question I have. Sure. It appears there was no evidentiary hearing in the district court with respect to the 2255 motion. Is that right? Well, correct. They did some inquiry of his trial counsel and had gotten an affidavit from his second trial counsel and had a letter submitted by Mr. Sargent, who was his first trial counsel, who had submitted the... I mean, yeah, they could have asked for one, right? Yes. And I mean, I presume it's the petitioner's burden to show entitlement to relief. So my question is, you know, we do have this absence of any explanation as to why he took the stand, whether he would have taken the stand absent the car evidence coming in and so on. I mean, don't we hold that against the petitioner here for not asking for an evidentiary hearing, bringing in the lawyer, potentially Mr. Robinson himself testifying and explaining that, you know, absent the car evidence coming in, I wouldn't have testified. But we don't have that. So now we have nothing but speculation. Right. And I guess the question is, even if there would have been that evidentiary hearing, it still, I guess, likely would have been speculation as to whether or not he would have taken the stand. I think it kind of goes to... It would be speculation. There would be evidence. Testimony. Potentially it would be testimony, which the judge could take into account. Wasn't he pro se on his 2255 at this point? Yes, he was. Counsel was not appointed until this appeal, is that right? That is correct. And he was also in custody, was he not? He was serving his sentence at the time? He recently just got out. Recently. Do we know on the 2255 that he did not ask for a hearing? That I don't know off the top of my head. It should be in the docket on the right. Yeah, I don't know. I just don't recall. I don't know. It probably is in the docket. I just don't know. But I think that the key issue here, of course, is whether or not Mr. Robinson was prejudiced by his counsel's failure to object to the search and the other issues that were raised in our brief. And I think that it also comes down... You had raised the question earlier to Eppley about doesn't that change the calculus of whether he would decide to take the stand? I think that's very key. The evidence in the Lincoln here is the only evidence that connected really Mr. Robinson to the tools that were found in the field and the location of the burglary. They would not have discovered the fact that he was on supervised release, that he had mail in the briefcase that was found in the Lincoln. The tools there, he admitted, were his. You're saying that once they had his physical body and identified him, that they wouldn't have connected it to the supervised release? Well, the judge might... I mean, well, he wouldn't have been there answering the questions on the stand if he would have decided not to take the stand. That would not have come in. Okay. They would have known it, but they couldn't tell it to the jury. The jury would not have known that. Exactly. Exactly. So I do think that the outcome of the trial would have been reasonably likely to be different. And might we reasonably also conclude that he felt the need to take the witness stand? Weren't there three different questions asked by government counsel eliciting the fact that he exercised his right to post-arrest silent? Correct. So is it reasonable for us to assume that a defendant in his position might think, you know, this looks pretty bad. There's no objection by my lawyer. The jury's heard three times that I was arrested, advised of my Miranda rights, and that I exercised my constitutional right to remain silent. Correct. But it looks bad. Maybe I need to get on that witness stand and defend myself? Yes. Everything that happened at the trial made it look very bad for Mr. Robinson. The tools that were found in the Lincoln that should have been, in my opinion, excluded, had to explain that away. Why were they so similar? Why were the tools in the field? Had to get on and explain the person that he had brought up to the area. Why was he in the area? All of this, certainly, had his counsel been performing as they were supposed to under the Sixth Amendment, would not have come in. I think that that is key. And I think that Mr. Robinson, honestly, should not have been taking the stand had his trial counsel been performing as they should have. Had counsels... Sorry to interrupt you. Yes. Robinson admits the tools belong to him, but only when he's testifying. Only when he's testifying. And his counsel specifically asked him. Absent that, there's no link. There's no link, absolutely. Even if he would have taken the stand, I think that had his counsel opened the door for that without the tools being in from the Lincoln, that is a whole other question of ineffective assistance of counsel that we would be dealing with at that point. Judge Merritt said the evidence against your client was overwhelming. Why do you think he was mistaken? I think he's mistaken by the fact that, first of all, we deal with the issue of, would Mr. Robinson have even been taking the stand to begin with? That's really the critical key that led the District Court to say that the evidence against him was overwhelming. He admitted that the tools in the field were his. He opened the door about the fact that he was in the area while he was on probation, should not have been there. The whole story about, I dropped this person off, this person's not a witness, all of that being against Mr. Robinson when he's taking the stand, when Mr. Robinson very well probably would not have taken the stand to begin with. That's where all of this evidence where the District Court says, oh, it's overwhelming against your client. I think that if the evidence against the Lincoln is suppressed, I think that is key in this case. I think that that, in addition to everything else, leads to believe that the errors of trial counsel, in fact, were prejudicial against Mr. Robinson. If I may, counsel, am I right that at the time Judge Merritt, that was on direct appeal, the issue concerning ineffective assistance of counsel on challenging the sufficiency of the affidavit for the search, that wasn't properly before the court then, correct? That was first raised on the 2255? Right. So at that time, Judge Merritt, the fruits of the search were still in, in terms of evidence against the defendant when he characterized the affidavit. Yes, that's true. Yes. Counsel, just as a point of learning for me, on the portion about the improper reference to the failure to testify, could, in the narrative of what the police did, could they say or could they be asked, did you give them Miranda warnings? If they had not gone on to say, and he said nothing. Right. That's my understanding of what the law is, is that they can be asked, did you give him the Miranda warnings, period. Okay. Yes. But the problem is that, of course, they knew what the answer was going to be. I understand. I just was thinking about jurors who see TV so much. Right. If they didn't know they were given the Miranda warnings, I thought they might take it against the police. Thank you. That's instructive.  That case will be submitted and the clerk may call the next. Yeah. And Ms. Steffes, we thank you.